**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DENISE F.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 5195** |
| | ) | |
| **MARTIN O'MALLEY,[1]** | ) | **Judge Rebecca R. Pallmeyer** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Denise F. first applied for Supplemental Security Income ("SSI") disability benefits on March 14, 2014. She alleged that a combination of issues, including diverticulosis, loss of hearing and vision, anxiety, and degenerative disk disease of her neck and back, made her unable to work as of that date.[2] After a hearing, an administrative law judge ("ALJ") denied her claim in July 2017 on appeal. The ALJ found in his written decision that Plaintiff was not disabled and could still perform work as a cleaner, laundry worker, or "cleaner, polisher" despite her limitations, and the Social Security Appeals Council declined to review this decision in May 2018, rendering it final for the purposes of judicial review.[3] Plaintiff now seeks judicial review of that decision under 42 U.S.C. § 405(g), arguing that the ALJ erred in his evaluation of her medical records and

---

[1]     Martin O'Malley assumed the position of Acting Commissioner of Social Security in December of 2023 and should be substituted as the named defendant in this action. See FED. R. CIV. P. 25(d).

[2]     Plaintiff's original application materials listed an alleged onset date of October 10, 2003. Because the SSI program does not pay benefits for any time prior to the month following the month of application, however, *see* 20 C.F.R. §§ 416.330, .335, Plaintiff voluntarily amended her alleged onset date to her date of filing (March 14, 2014) at her hearing before the ALJ on April 20, 2017. (29, 209.)

[3]     While Plaintiff's complaint was technically filed after the statutory sixty-day limit for seeking review, her administrative counsel filed a request for extension of time with the Administration to preserve the timeliness of her claim before the statute of limitations expired. Plaintiff's request was retroactively granted on October 24, 2018. (*See* Compl. [1] ¶ 7; Suppl. Admin. Record [14-1] at 875.)

testimony.[4]  For the reasons explained below, the court remands the matter to the Administration for further consideration.

## BACKGROUND

### I.  Documentary Evidence

In reviewing an ALJ's decision on an application for Social Security benefits, a court considers all evidence in the administrative record before the ALJ, including both medical records submitted with the initial application and records post-dating the application up to the date of the ALJ's decision.  *See Atkins v. Saul*, 814 F. App'x 150, 152, 155 (7th Cir. 2020).  The record in this case contains multiple years' worth of treatment records that overlap substantially with the procedural history of Plaintiff's claim for SSI benefits.  The court will begin by reviewing Plaintiff's medical history preceding her benefit application in March 2014, then discuss the medical history between that date and her hearing in April 2017, and finally summarize the hearing and the ALJ's July 2017 decision.

#### A.  Medical History Pre-2014 Benefit Application

Plaintiff was born in 1971 and completed school through the eleventh grade but did not graduate from high school and has not obtained a GED.  (Admin. Record [13-1] ("R.") 30–31, 33–34, 221.)  She recalls working at McDonald's for several months in her twenties, but has no other known history of employment other than babysitting for two children from 2001 to 2003, and, at the time of the ALJ's hearing in 2017, did not recall the date she last worked.  (R.  30–31, 52, 230–31.)  She has three daughters, one born in or around 1996, one in or around 1998, and one in or around 2007.  (R. 31, 374.)  She first applied for disability benefits in 2005 but was denied at the initial and reconsideration stages.  (R. 210.)  At the time of her hearing in 2017, she had lived in a house with her mother and her daughters (the fathers evidently not on the scene) for

---

[4]     Plaintiff's appeal from the denial of benefits has been fully briefed since 2019, but was only recently reassigned to this court.

over four years. (R. 34.) Since 2005, she has received primary-care treatment from Drs. Obaida Shahkhan and Saroj Verma and physician assistant Mia Werner.[5] (R. 225, 403.)

Since at least 2012, Plaintiff has experienced diverticulosis, or the development of small pouches ("diverticula") in the digestive tract; these pouches can become painfully inflamed in a condition known as diverticulitis. Plaintiff had several emergency room ("ER") visits for abdominal pain in 2012, and underwent a colonoscopy in August of that year conducted by gastroenterologist Dr. Sakhawat Hussain; the scan showed multiple diverticula present in her proximal descending colon. (R. 663, 673, 688.) Plaintiff visited the ER again in October 2013 and June 2014 for abdominal pain related to diverticulitis, and was discharged with instructions to stay on a liquid diet for 48 hours and prescriptions for antibiotic medication. (R. 246, 322, 352.) The record does not show that she ever underwent surgery or other major interventions for her condition.

Also since at least 2012, Plaintiff alleged, she suffered from chronic back pain that she attributes to degenerative disk disease. Whether this condition was formally diagnosed prior to Plaintiff's application for benefits is not clear from the record, though notes from a routine gynecology exam in September 2013 state that Plaintiff had a preexisting condition of two slipped discs in her back. (R. 309.)

Plaintiff also alleges compromised vision and hearing. She describes deafness in her left ear due to childhood meningitis (R. 330), and compromised eyesight in her left eye due to an early surgery (R. 288, 380, 416). In May 2013, Plaintiff underwent a comprehensive eye exam at the Midwest Eye Center, which showed her corrected visual acuity as roughly 20/20 in her right eye and 20/70 in her left eye. (R. 289.)

---

[5] While Dr. Verma is consistently designated as Plaintiff's primary-care physician in her medical records (*see, e.g.*, R. 24, 464, 619, 658), the nature of Dr. Shahkhan's treatment relationship with Plaintiff is somewhat less clear. Both doctors list themselves as working at the same address on South Ewing Avenue in Chicago; some records list Dr. Shahkhan as the "provider" or "attending physician" but Dr. Verma as Plaintiff's "PCP" (presumably, "primary-care physician") (*see, e.g.*, R. 533, 655), while others list Dr. Verma as the provider but bear Dr. Shahkhan's electronic signature (*see, e.g.*, R. 615). Regardless, it is clear that both have regularly provided Plaintiff with primary care for many years.

In addition, Plaintiff has experienced depression and anxiety for a number of years, but there is no record that she has sought out treatment from a psychiatric specialist. (R. 239.) In a 2009 ER visit for chest pains, she was diagnosed with anxiety attacks. (R. 373, 464–96.) She has taken antidepressants and anti-anxiety medication prescribed by Dr. Shahkhan and Verma's clinic since at least 2014. (R. 223, 374, 392.) Plaintiff also has hypothyroidism and high cholesterol, for which she has taken levothyroxine and fenofibrate since at least 2014. (R. 244, 309.)

Plaintiff filed for SSI benefits on March 14, 2014. (R. 192–96.) She named the following issues as grounds for her disability: poor vision in her left eye, high cholesterol, anxiety, diverticulosis, degenerative disk disease of the upper and lower spine, low thyroid, and left-ear deafness. (R. 220.) In her initial application, Plaintiff stated that her back problems interfered with her ability to bend over, get out of bed, and stand or sit for extended periods of time, and that she relied on her mother and older daughter for household chores and shopping. (R. 238–45.) She described feeling "tranquilized throughout the day" due to her medication, being in "constant pain with [her] back, and "feel[ing] like her world is ending." (R. 239, 244, 245.) Plaintiff's mother helped prepare the disability application on her behalf. (R. 244.)

### B. Medical History Post-Benefit Application

After filing her initial SSI application, Plaintiff returned to the ER at least twice in 2014 with complaints of severe abdominal pain due to diverticulitis. (R. 347, 551.) Both visits were brief and did not result in hospitalization.

#### 1. August 2014 Consultative Exams and September 2014 Initial Determination

In connection with her application for SSI benefits, Plaintiff saw a state-hired consulting internist (Dr. Fauzia Rana) and psychiatrist (Dr. Ana Gil) on August 28, 2014. During a 30-minute physical exam, Dr. Rana noted that Plaintiff's "shoulder, elbow, and wrist joints [had] full range of motion without pain" and that she exhibited muscle strength of 5/5 in all extremities. (R. 380–82.)

4

The doctor noted that Plaintiff had no difficulty performing physical maneuvers and had a normal gait, a full range of motion, and no spinal difficulties.  (R. 383.)  Dr. Rana acknowledged Plaintiff's prior medical history and her complaints to date but opined that Plaintiff "[was] able to sit, stand, walk, lift, carry, speak, and hear without difficulty."  (R. 384.)

In the examination with Dr. Gil, Plaintiff denied any suicidal thoughts or hallucinations, but described frequent feelings of anxiety, forgetfulness, and depression, as well as periodic crying spells.  (R. 373–74.)  She stated that her anxiety attacks "can last for about an hour," and "occur at least six times per week," interfering with her sleep and making her unable to travel by herself.  (R. 373.)  Indeed, Dr. Gil noted, Plaintiff was accompanied by her mother and two daughters on public transportation for the exam and reported that she was unable to travel alone due to her anxiety.  (*Id.*)  Dr. Gil diagnosed Plaintiff as experiencing moderate depressive disorder, severe generalized anxiety disorder, and severe panic attacks with agoraphobia.  (R. 377.)

In September 2014, state agency doctors Phillip Galle and Glen Pittman reviewed Plaintiff's medical records, including the medical opinions from Drs. Rana and Gil, to make the initial SSI determination.  (R. 79–88.)  Dr. Galle identified Plaintiff's hearing and anxiety issues (but not her back issues) as medically determinable impairments, but concluded that they did not meet the requisite criteria for any listed impairments in the Code of Federal Regulations ("CFR").  (R. 84–85.)  He assigned "some weight" to Dr. Rana's opinion and relied on it to determine that Plaintiff had the residual functional capacity ("RFC")—the Administration's term for "the most [a claimant] can still do" in a work setting "despite [their] limitations," 20 C.F.R. § 416.945(a)(1)— to perform "light" work with some restrictions.  (R. 86–88.)  Dr. Pittman concluded, after reviewing Dr. Gil's report, that Plaintiff's depression and anxiety imposed only "mild" limitations on her daily functionality and that her psychiatric impairment was "not severe."  (R. 84–85.)  The Commissioner issued an initial denial of Plaintiff's claim on September 22, 2014, and Plaintiff filed a request for reconsideration on November 10, 2014.  (R. 126, 131.)

## 2.    October 2014 Fall and Subsequent Treatment

On or around October 26, 2014, Plaintiff suffered a fall in the shower and sought medical care from her primary-care physicians, Drs. Shahkhan and Verma, for pain in her lower back and tailbone a few days later.  (R. 398.)  X-rays showed mild levoscoliosis of her lumbar spine (i.e., an abnormal leftward curvature), but no acute fracture.[6]  (R. 866.)  Dr. Verma ordered a follow-up MRI; the results of that test showed a mild disc bulge between Plaintiff's L4 and L5 vertebrae and mild foraminal stenosis, or narrowing of the spaces between vertebrae.[7]  (R. 399.)  Plaintiff continued to complain of ongoing pain in her lower back to Drs. Shahkhan and Verma through the winter of 2014 and spring of 2015; she had a positive result on a "straight-leg raising" test on December 9, 2014, and another on April 3, 2015, indicating potential nerve root compression.[8]  (R. 392–96, 415.)

On November 11, 2014, Dr. Verma wrote[9] a note on a pharmacy prescription slip—presumably for purposes of Plaintiff's disability application, based on contemporaneous notes from Drs. Shahkhan and Verma's clinic—that stated: "Pt. has been following in our clinic since 2005[.]  Pt. is unable to work due to chronic back pain, anxiety, and deafness in her L ear."  (R. 247, 395.)  In her contemporaneous notes, Dr. Verma (or her assistant) made a record of Plaintiff's

---

[6]    *See    Levoscoliosis & Dextroscoliosis*, Cleveland Clinic (Sept. 16, 2022), https://my.clevelandclinic.org/health/diseases/24193-levoscoliosis--dextroscoliosis.

[7]    *See    Foraminal    Stenosis*,    Cleveland    Clinic    (Mar.    28,    2023), https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis.

[8]    The straight-leg raising test is a commonly used procedure for detecting nerve root pinching or irritation in a patient's lower back during a physical exam.  *See* Gaston O. Camino Willhuber & Nicolas S. Piuzzi, *Straight Leg Raise Test*, Nat'l Libr. of Med. (June 12, 2023), https://www.ncbi.nlm.nih.gov/books/NBK539717.

[9]    The court notes that while the prescription slip is on Dr. Verma's stationery and the ALJ, as well as both parties, attributes it to Dr. Verma (*see* R. 118; Opening Brief [17] at 8–9; Def.'s Resp. to Pl.'s Mot. for Summary Judgment [20] at 10–11), the signature on the slip actually appears to be from Drs. Shahkhan and Verma's physician assistant Mia Werner (R. 247). Because neither party has addressed this question, however, the court will assume for the sake of this appeal that it is attributable to Dr. Verma.

MRI results and also noted that Plaintiff had "[complained of] chronic back [pain] for almost 10 years." (R. 395.)

On January 26, 2015, Dr. Shahkhan and Ms. Werner prepared a physical RFC medical source statement in support of Plaintiff's request for reconsideration.[10] (R. 403–06.) In this form, Dr. Shahkhan identified Plaintiff's degenerative disc disease (including her bulging disc identified on the MRI), as well as her left-ear deafness and chronic fatigue, as contributing factors to her physical limits. (*Id.*) Through check marks on the form's preset fields, she confirmed a number of limitations on Plaintiff's ability to work, including that Plaintiff: could only rarely lift items weighing ten pounds, and could only occasionally do so for items around five pounds (*id.*); needed to lie down or recline for at least one hour during an eight-hour work day (R. 404); and frequently experienced pain and stress sufficient to interfere with her ability to perform simple tasks (R. 405). Dr. Shahkhan opined that Plaintiff would need to be "off task" for roughly twenty percent of the average work day and, due to her impairments, would be absent from work approximately three days every month. (R. 406.) Dr. Shahkhan listed, as bases for her opinion, Plaintiff's "History & Medical File," her "Progress & Office Notes," her "Physical Examinations," and her "X-rays, CT Scans or MRIs," via check marks on the form's fields. (*Id.*) Dr. Shahkhan did not offer any further details on the exact scope or nature of the records she had reviewed in filling out the RFC statement.

### 3. May 2015 Consultative Exams and June 2015 Reconsideration Decision

After Plaintiff filed for reconsideration of the Administration's initial denial of her SSI claim in November 2014, she attended another round of consultative physical and psychiatric examinations on May 21, 2015. The physical examiner, Dr. Peter Biale, noted that Plaintiff attended the exam with her mother "because she gets lost and doesn't remember directions

---

[10] Both Dr. Shahkhan's and Ms. Werner's signatures and professional qualifications are listed on this first RFC form. (R. 406–08.)

properly." (R. 416.) He observed that Plaintiff complained of low back pain when moving from sitting to supine position and back again, and had difficulty squatting because of the pain, but had a normal gait and full range of motion in her joints. (R. 417–18.) Dr. Biale noted in examining Plaintiff's back that she had full range of motion in her cervical spine but a limited range in her lumbosacral spine. (R. 418.) He documented a positive straight-leg raising test at five degrees, but did not specify if this was sitting or supine. (*Id.*) He stated that Plaintiff had some sensory diminishment in her left leg, but noted normal motor strength in her arms and legs. (R. 418–19.)

Dr. Don White, the psychiatric examiner, noted that Plaintiff was not exhibiting suicidal thought or hallucinations, but had "occasional death wishes" and frequent anxiety attacks, agoraphobia, and depression, as well as a history of being medicated for psychiatric conditions. (R. 423.) He opined that Plaintiff exhibited "[e]vidence of clinical anxiety and depression" (he did not offer an assessment of its severity) and impaired judgment, but that she "appear[ed] to have adequate Adaptive Behavioral Functioning." (R. 424.)

In June 2015, as part of the reconsideration of denial of benefits, state agency doctors David Mack and Tyrone Hollerauer reviewed Plaintiff's medical records to date. (R. 91–105.) They noted that Plaintiff had self-reported worsening back pain since her fall, as well as difficulty standing straight and keeping her balance, and that she stated that she was on "heavy pain medication" (presumably Norco and Motrin as prescribed by Drs. Shahkhan and Verma, based on contemporaneous notes from their office). (R. 92, 394–98.) Like Dr. Galle, Dr. Mack identified Plaintiff's gastrointestinal and anxiety issues, but not her back issues, as medically determinable impairments that did not meet the criteria required under the CFR's Listings. (R. 98–100.) He completed another RFC assessment based on Dr. Biale's physical exam that also stated Plaintiff was capable of performing "light" work with some restrictions. (R. 100–03.) Dr. Hollerauer reaffirmed that Plaintiff's mental conditions were not severe. (R. 99.) On June 17, 2015, the Administration denied Plaintiff's request for reconsideration; Plaintiff submitted an appeal to have her case heard before an ALJ a few days later. (R. 138, 142.)

### 4.    July 2015 Car Accident and Subsequent Treatment

On July 12, 2015, Plaintiff was T-boned in her car while driving and was taken to the ER in an ambulance, complaining of neck pain, lower back pain, and decreased sensation in her right leg.  (R. 576.)  A CT scan performed at the time showed no fractures or posttraumatic spinal changes at the time, and Plaintiff was diagnosed with muscle strain and prescribed pain medication. (R. 579–80.)  But she visited Drs. Verma and Shahkhan's clinic a few weeks later on August 3 reporting continuing neck and back pain.  (R. 652.)  Drs. Verma and Shahkhan prescribed further pain medication and gave Plaintiff a "referral for PT"—presumably physical therapy—"for evaluation and treatment." (R. 653.)

In August 2015, Plaintiff began visiting a chiropractor (Dr. James Egan) and a pain management specialist (Dr. Ossama Abdellatif) to address this chronic pain.  She reported to Drs. Egan and Abdellatif that she was experiencing pain across her neck, back, and shoulders, as well as tingling and numbness in her hands, wrists, and legs.  (R. 438, 458.)  Dr. Egan conducted reflex and orthopedic evaluations of Plaintiff and noted several impairments, including positive results for nerve root compression on a number of orthopedic tests (including a straight-leg raising test), as well as a decreased range of motion on Plaintiff's neck, lower back, and shoulders.  (R. 459.)  Dr. Abdellatif diagnosed Plaintiff with cervical and lumbar radiculopathy and facet syndrome[11] and ordered diagnostic MRIs.  (R. 439.)  He opined that she should be "off duty" from work while undergoing treatment, pending further evaluation (it is not clear if he knew that Plaintiff was not in fact employed at this time).  (R. 440.)

---

[11]    "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column . . . includ[ing] pain, weakness, numbness and tingling" in a patient's extremities.  *Radiculopathy*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Feb. 26, 2024).  "Facet Joint Syndrome is a condition in which arthritic change and inflammation occur [in the spine], and the nerves to the facet joints convey severe and diffuse pain."  *Neurosurgery: Facet Joint Syndrome*, UCLA Health, https://www.uclahealth.org/medical-services/neurosurgery/conditions-treated/facet-joint-syndrome (last visited Feb. 26, 2024).

On September 10, 2015, Plaintiff underwent MRIs of her left shoulder, lumbar spine, and cervical spine.  (R. 461–63.)  The left shoulder MRI showed signs of "hypertrophic spurring . . . indenting the supraspinatus tendon and narrowing the subacromial space, possibly with mild impingement."[12]  (R. 461.)  The lumbar spine MRI found a "3-4 mm subligamentous posterior disk protrusion/herniation" between Plaintiff's L4-L5 vertebrae.[13]  (R. 462.)  The cervical spine MRI found four disc herniations between Plaintiff's C3-C4, C4-C5, C5-C6, and C6-C7 vertebrae, as well as some foraminal narrowing and spinal stenosis at these levels.  (R. 463.)

Plaintiff continued to visit Drs. Egan and Abdellatif throughout the fall and winter of 2015 and into early 2016 for physical examination and treatment.  Throughout this period, she continued to exhibit pain, a decreased range of motion, and positive tests for nerve root compression.  (R. 430–37, 441–57.)  Dr. Egan reported several times that Plaintiff was "not medically stationary" and that her "prognosis [was] guarded."  (R. 445, 447, 450, 453, 456–57.) Plaintiff was still experiencing pain when she completed her treatment in February 2016.  (R. 442.)

Plaintiff also continued to report neck pain when she sought treatment for unrelated medical issues from Drs. Shahkhan and Verma office in early 2016.   (R. 638, 641.) Dr. Shahkhan's notes from April through August of that year do not specifically describe any neck or back pain (R. 625–37), but Plaintiff again complained of pain in her left lower back and back when at the clinic in September 2016  (R. 622)  She reported at that time that she was stiff and bent over when awakening, and that she had experienced another flareup of her diverticulitis in

---

[12]     The supraspinatus tendon is attached to a muscle of the shoulder joint and forms part of the rotator cuff.  *Stedmans Medical Dictionary* 571910, Westlaw (database updated Nov. 2014).  This tendon passes through a narrow space at the top of the shoulder known as the subacromial space, and can rub or catch (i.e., become impinged) through, among other causes, the growth of bony spurs on the bone at the top of this space, called the acromion.  *Shoulder Impingement*, Nat'l Health Serv. (Apr. 29, 2020), https://www.nhs.uk/conditions/shoulder-impingement-syndrome.

[13]     A subligamentous herniation is one that has not yet "moved past the ligament that separates the disc from the open spinal canal."  7 Monique Leahy, *Attorneys Medical Advisor* § 71:180 (2023).

2016; she visited the ER several times with severe abdominal pain and was hospitalized for three days in November.  (R. 616, 619, 742–81.)  By December, however, Plaintiff reported to Dr. Verma that  this pain had improved.  She made no specific complaints about her neck or back, and a physical exam recorded no specific issues.  (R. 613–14.)

In late 2016, Plaintiff sought additional specialty care for her back and neck problems from Dr. Kishan Chand of Southeastern Medical Center, and visited him roughly four to five times through the end of 2016.[14]  (R. 22–24.)  Dr. Chand referred Plaintiff to a physical therapist, who she visited from January through April of 2017.  (R. 803–64.)  In her initial consultation with the physical therapist, Anda Zavada, Plaintiff reported that she had previously had success in reducing her pain through physical therapy after her initial 2015 accident (though this treatment is not reflected in the record), but that the pain had "returned with more severity."  (R. 804.) Zavada described Plaintiff's posture as "rigid and very guarded," and observed that her "[b]ilateral LE sterngth [sic] [was] decreased in general throughout due to disuse," though this was difficult to test accurately due to Plaintiff's lower back pain.  (R. 805.)  Aside from her back problems, Plaintiff also continued to seek treatment for her ongoing stomach pain from diverticulitis, including visiting the gastroenterologist (Dr. Sakhawat Hussain) who had performed her 2012 colonoscopy in January and March of 2017.[15] (R. 26–27.)

Dr. Shahkhan prepared two additional physical RFC medical source statements in connection with Plaintiff's appeal of the Administration's denial upon reconsideration of her claim for benefits, one in November 2016 and one in April 2017.  (R. 425–29, 869–72.)  Both statements largely convey the same information, including Plaintiff's diagnoses of cervical and sacral disc bulges, degenerative disc disease, and diverticulitis.  (R. 425, 869.)  They endorse similar

---

[14]    Plaintiff described having difficulty obtaining her medical records from Dr. Chand at the April 2017 hearing before the ALJ; they are not in the record before this court, and thus presumably were not submitted before he rendered his decision.  (R. 21.)

[15]    Plaintiff also described having difficulty getting her updated (post-2012) medical records from Dr. Hussain, and they too are not included in the administrative record.  (R. 22.)

limitations on Plaintiff's ability to work as Dr. Shahkhan's first RFC medical source statement, including that Plaintiff could only rarely lift ten pounds and occasionally five, could stand and walk for just three hours at a time, and needed to be "off task" for 20 percent of a given work day. (R. 425, 428, 869, 872.)  Unlike in her first RFC statement, however, Dr. Shahkhan also opined in her second and third statements that Plaintiff could no longer perform reaching or keyboarding tasks with her hands.  (R. 427, 871.)

## II.     April 20, 2017 Administrative Hearing

On April 20, 2017, Plaintiff attended a hearing before ALJ Nathan Mellman on her appeal of the Administration's denial of her claim for benefits.  (R. 14.)  Plaintiff was represented by counsel at this hearing, and an impartial vocational expert also testified.  (R. 17.)

### A.     Plaintiff's Testimony

With regard to her daily activities, Plaintiff testified that her mother and daughters sometimes helped her dress when her back was stiff and painful and she could not bend.  (R. 36.) She showered and used the toilet independently, and was able to cook simple meals for her children, but her mother handled shopping for the family and helped Plaintiff carry her laundry to and from the laundromat because of her back pain.  (R. 37–38.)  Plaintiff's testimony regarding her ability to drive and navigate independently was not fully consistent with prior remarks she had made to Dr. Gil that she was unable to travel alone (R. 373) and to Dr. Biale that she got lost and did not remember directions properly (R. 416).  She testified that her mother had helped her navigate to the ALJ's office for the hearing that day (R. 43), but that she drove her youngest daughter to and from school every day (R. 35) and also drove herself to her own doctors' appointments  (R. 50).

Plaintiff stated that at least as often as every other day, she suffered from significant back pain, lasting for as long as an entire day.  (R. 37.)  She reported that the pain had worsened after the accident, and that she got temporary but not lasting relief from physical therapy.  (R. 51.)  She estimated that she was able to sit for half an hour, and to walk one city block's length, but was

unsure how long she could stand.  (R. 43.)  She rated her current pain at a six out of ten.  (R. 48.)  She estimated that she could lift less than five pounds.  (R. 50.)

Her gastrointestinal issues continued as well.  Plaintiff said she had gone to the hospital several times for abdominal pain in 2015 and 2016.  (R. 46–47.)  She described being consistently constipated and needing to spend between 20 to 30 minutes on the toilet.  (R. 52–53.)  She described her stomach pain from diverticulitis as "unbelievable" and compared this pain to childbirth.  (R. 45.)  She stated that her stomach issues had worsened recently and that her gastroenterologist Dr. Hussain had recommended she get another colonoscopy.  (R. 27.)

With regard to her mental health issues, Plaintiff testified that on a near-daily basis she experienced panic attacks that lasted at least 20 minutes and sometimes more than an hour, and as many as three crying episodes every day lasting 15 to 20 minutes.   (R. 49, 56, 60.)  She needed anxiety medication at night to help her sleep.  (R. 49–50.)  She had trouble remembering details and appointments (R. 55) and became anxious in crowded places (R. 57).  She also testified that her medications made her drowsy (R. 58), that she frequently felt drained (R. 61), and that she had trouble reading fine print due to her vision impairment (R. 69.)

### B.    Vocational Expert

Pam Tucker, an impartial vocational expert ("VE"), also testified at the April 2017 hearing.  The ALJ asked the VE to consider an individual of the same age and education as Plaintiff with additional limitations beyond the regulatory definition of "light" work: lifting and carrying no more than 20 pounds occasionally and just 10 pounds frequently; sitting, standing, and walking for 6 hours or less; never climbing ladders, ropes, or scaffolds; and never working with very small or vibrating objects or reading small print.  (R. 62.)  The VE concluded that a person with these limitations would be able to perform work as a cleaner (estimating that 115,000 such positions were available in the national economy), as a laundry worker (95,000 estimated positions), or as a "cleaner, polisher" (23,000 positions), based on the listings in the Administration's Dictionary of Occupational Titles ("DOT").  (R. 63.)  These same jobs would remain available even if the person

had additional physical restrictions of being unable to stoop, kneel, and crawl frequently, and mental restrictions of being unable to work on joint tasks or interact with the public on a regular basis.  (R. 64.)

The VE testified, further, that an individual with these physical limitations who could perform only sedentary work (i.e. work involving little to no lifting, standing, or walking) would be unable to perform any work in the national economy, but that if Plaintiff's mental restrictions (being unable to work on joint tasks or regularly interact with the public) were lifted while these additional physical restraints remained in place, she would be capable of working as a "callout operator" (25,000 estimated positions), a "telephone quotation clerk" (23,000 positions), or an "address clerk" (20,000 positions).[16]  (R. 64–65.)  The VE also acknowledged, however, that a restriction of being off task for 15 percent or more of a typical eight-hour workday or absent from work for two or more days a month would preclude all available jobs (R. 67), as would the further restriction of being unable to perform reaching or keyboarding  (R. 76).

### III.    The ALJ's July 3, 2017 Decision

In his July 3, 2017 decision, the ALJ found Plaintiff not disabled based on the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920.  (R. 107–25.)  Under these regulations, the ALJ must determine (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether she has a severe impairment (or combination of severe impairments);

---

[16]      According to the VE, a "callout operator" is responsible for "taking calls for people calling about credit information, updating credit accounts, [and] relaying the phone call to other departments," and an "address clerk" is responsible for "sorting mail and putting addresses on mail or publications."  (R. 66.)  The VE did not explain the role of "telephone quotation clerk" in the hearing, but the DOT states that this role involves "[a]nswer[ing] telephone calls from customers requesting current stock quotations" and relaying customer calls to registered financial representatives.  U.S. Dep't of Lab., *Dictionary of Occupational Titles* 237.367-046, 1991 WL 672194 (4th ed. 1991).  The court notes that, while the vocational expert testified that these jobs had significant numbers of positions available in the national economy, their names and descriptions all appear relatively antiquated. The court suspects at least some of these job duties have been automated.  As the Seventh Circuit has lamented, the DOT has not been updated in over thirty years, and efforts to replace it as the SSA's designated source of job titles for use in disability applications have repeatedly stalled.  *Ruenger v. Kijakazi*, 23 F.4th 760, 761–62 (7th Cir. 2022).

(3) if severely impaired, whether her impairments meet or equal the criteria for any listed impairment in the CFR; (4) if not listed there, whether her RFC would allow her to perform her past relevant work; and (5) if she cannot perform her past work, whether she can perform any other work that exists in significant numbers in the national economy.

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of March 14, 2014. (R. 112.) At Step Two, the ALJ designated Plaintiff's spine condition as a "severe" impairment. (R. 112.) Plaintiff's remaining impairments, including her vision and hearing problems, her diverticulitis, her hypothyroidism and high cholesterol, and her depression and anxiety, were, the ALJ concluded, "non-severe" and had "little effect on her functioning." (R. 112–13.)

At Step Three, the ALJ found that Plaintiff's degenerative disk disease was not sufficiently severe to qualify as a per se disability under the Administration's Listings of Impairments. (R. 114.) The ALJ next considered whether Plaintiff had the RFC to perform "restricted light work as defined in 20 CFR 416.967(b)." (R. 114.) In determining that she did, the ALJ compared Plaintiff's subjective alleged symptoms to the objective medical evidence in her record, as well as the medical opinions of her treating physicians, the state-hired consulting physicians who had examined her, and the state-hired non-examining review physicians who had assessed her file at the initial and reconsideration stages. (*Id.*) Based on this evidence, the ALJ determined that Plaintiff's self-described limitations were "not entirely consistent with the medical evidence and other evidence in the record" and that she was "capable of light work with some postural, visual, and environmental restrictions." (R. 115, 119.)

Because Plaintiff's lack of relevant work since 2003 rendered Step Four irrelevant, *see* 20 C.F.R. §§ 416.920(a)(4)(iv), .965, the ALJ moved directly to Step Five—whether Plaintiff could successfully adjust to other jobs in the national economy given her age, education, work experience, and RFC. (R. 119.) He determined under 20 C.F.R. § 416.969 and § 969a that Plaintiff was unable to perform the full range of "light" work as defined in the regulations, but could

15

still perform the VE's specified jobs of cleaner, laundry worker, and "cleaner, polisher." (R. 119–20.)

## LEGAL STANDARD

To be considered disabled, an applicant for SSI benefits must prove that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3). A claimant who is found "not disabled" may challenge the Commissioner's final decision in federal court under 42 U.S.C. § 405(g). The court will uphold the ALJ's decision if it applied the correct legal standards, was based on substantial evidence, and was adequately explained. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citation omitted); *see Biestek v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019). The court reviews the entire record, but should not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's" in evaluating the decision. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

The court will not, however, simply "rubber-stamp" the ALJ's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Even where some record evidence supports the ALJ's conclusion, it is not upheld unless the ALJ has built an "accurate and logical bridge" between this evidence and the conclusion. *Jeske*, 955 F.3d at 587. Under the familiar *Chenery* doctrine of administrative law, the court's review is limited to the ALJ's actual rationale for his decision and will not consider after-the-fact justifications. *Id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)). There is an exception to this rule, however, where alternative arguments clearly establish that the ALJ's error was harmless, meaning that the ultimate result on remand would not change; in those circumstances there is no need for remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

## DISCUSSION

Plaintiff advances several grounds for reversing the ALJ's decision below. She argues that the ALJ (1) erred in his step-three determination that her back and neck issues did not meet a Listing, (2) ignored substantial evidence in his assessment of her mental impairments, (3) failed to properly weigh the objective medical evidence in her record, (4) wrongly discredited her statements regarding her subjective symptoms, and (5) wrongly relied on the VE's flawed testimony. The court addresses each in turn.

## I.     The ALJ's Step-Three Determination

At Step Three, the ALJ must determine whether a claimant's impairments are "severe enough" to be "presumptively disabling" under one or more Listings, making further individualized inquiry into their ability to work unnecessary. *Jeske*, 955 F.3d at 588; *see* 416 C.F.R. § 920(a)(4)(iii). In making this determination, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Jeske*, 955 F.3d at 588 (citing *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). Plaintiff "has the burden of showing that [her] impairments meet a listing, and [s]he must show that [her] impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Alternatively, Plaintiff may make a showing of disability by establishing that her impairment is medically equivalent to a Listing, or is accompanied by symptoms "equal in severity to those described in the Listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *see* 20 C.F.R. § 416.926.

The only Listing that Plaintiff identifies in her challenge to the ALJ's decision at Step Three is Listing 1.04, concerning "disorders of the spine." (Opening Brief [17] (hereinafter "Pl.'s Br.") at 8–9). To qualify for the Listing, these disorders, which include "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [and] vertebral fracture," must be accompanied by the specified criteria in either 1.04A, 1.04B, or 1.04C. 20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.04 (2017). Plaintiff argues that there is sufficient evidence

for her neck and back conditions to meet either 1.04A or 1.04C, which respectively read as follows as of July 2017:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*

The court agrees with Plaintiff that the record before the ALJ contained evidence suggesting she met all of Listing 1.04A's criteria for at least a certain period prior to the ALJ's July 2017 decision, though not necessarily all the way back to her original March 2014 application for benefits.[17] Plaintiff's 2014 MRI records showed a bulging disc in her lower spine, and she exhibited lumbar tenderness, limited range of motion, diminished sensation in her left leg, and a positive straight-leg raising test in her May 2015 consultative physical exam with Dr. Biale. (R. 399, 417–18). MRI tests performed after her July 2015 car accident showed a "protrusion/herniation" at the same level in her lower back as well as four herniated discs in her neck. (R. 462–63).[18] Drs. Abdellatif's and Egan's notes from August 2015 through February 2016 describe pain in Plaintiff's back and neck radiating to her arms and legs, a limited range of motion in her neck and back, muscle weakness and sensory loss in her arms and legs, and several

---

[17] The Commissioner argues, briefly, that Plaintiff does not meet her burden since she does not identify any physician's opinion that her degenerative disc disease met or equaled the criteria of the listing. (Def.'s Resp. to Pl.'s Mot. for Summ. J. [20] ("Def.'s Br.") at 5.) But there is no such requirement in the law: the ALJ must consider the entire medical record available to him, *see* 20 C.F.R. §§ 416.912, 920b, and Plaintiff's burden is satisfied if the elements of the Listing are established by that record, *see Ribaudo*, 458 F.3d at 583–84.

[18] Plaintiff also cites language from the September 2015 MRIs describing "hypertrophic spurring . . . indenting the supraspinatus tendon and narrowing the subacromial space, possibly with mild impingement." (Pl.'s Br. at 4–5 (citing R. 461).) But this is irrelevant for Listing 1.04, as this language comes from the notes describing Plaintiff's *shoulder* MRI.

positive straight-leg-raising tests in both legs. (*See* R. 430–60.) All of these symptoms track Listing 1.04A's four criteria and are strongly suggestive of nerve compression arising from Plaintiff's accident. Notably, Dr. Abdellatif diagnosed Plaintiff with cervical and lumbar radiculopathy and facet syndrome in August 2015 (R. 440), and Dr. Egan's records specifically referenced positive tests for nerve root compression in multiple orthopedic exams (*see, e.g.*, R. 441, 444, 452, 459). *Cf. Jeske*, 955 F.3d at 591 (finding Listing 1.04A not satisfied where "no medical records or other reports mentioned nerve root compression, nor did any of them indicate that all the indicia of nerve root compression were present").

In spite of this evidence in the record, the ALJ found in his written opinion that none of Listing 1.04A's criteria were met at any point in Plaintiff's record of medical history. His analysis at Step Three, however, provides little basis for determining how he reached this conclusion. That discussion consists of these two sentences:

> The medical evidence establishes degenerative disc disease of the lumbar/cervical spine with lumbar radiculitis, but the evidence does not satisfy the criteria of section 1.04. Specifically, the record is devoid of evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis with accompanying ineffective ambulation.

(R. 114.)

On its own, this short paragraph would be "the very type of perfunctory analysis" that the Seventh Circuit has "repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *See Minnick*, 775 F.3d at 935–36 (evaluating a nearly identical step-three paragraph addressing Listing 1.04, and citing cases); *Kastner v. Astrue*, 697 F.3d 642, 647–48 (7th Cir. 2012) (remanding based on a similarly perfunctory evaluation of 1.04). More recently, however, the Seventh Circuit has concluded that an ALJ's RFC analysis between Steps Three and Four may also be used to explain their conclusions at Step Three. *Jeske*, 955 F.3d at 590 (reasoning that "the five-step evaluation process comprises sequential determinations that can involve overlapping reasoning" and that ALJs should not be forced to duplicate work); *Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021) (following *Jeske*; distinguishing *Minnick* as a situation

where "both the [ALJ's] step-three discussion and the RFC analysis were inadequate," and *Kastner* as one where "the Commissioner's post hoc rationale . . . did not appear *anywhere* in the ALJ's opinion") (emphasis in original).  Thus, the court will read the ALJ's RFC analysis together with his step-three analysis to determine whether the reasoning in his opinion satisfies *Chenery*.

The ALJ's RFC analysis does acknowledge some of the above-cited evidence regarding Plaintiff's lower back issues when summarizing her medical history, but does not meaningfully engage with it.  For instance, the ALJ references Plaintiff's September 2015 MRI but does not mention Dr. Egan or address his written notes concerning her symptoms,[19] and addresses Dr. Abdellatif only by stating that his February 2016 recommendation that Plaintiff should be off work "appears to be a situational assessment and not of sufficient duration to be considered a capacity assessment."  (R. 117–18.)  This statement—as well as the pieces of evidence the ALJ draws out in his summary—perhaps suggest that he believed Plaintiff recovered from the acute effects of her accident over time and was no longer experiencing serious symptoms by the end of 2016.  For example, the ALJ noted Plaintiff's September 2016 complaint of back pain, but also highlighted reports from April, October, and December 2016 where Plaintiff reported no musculoskeletal or other physical issues to Dr. Shahkhan during routine, unrelated checkups.  (R. 117 (citing R. 634–35).)

But the ALJ cited no medical opinion explicitly stating that Plaintiff had recovered from her accident.  And the evidence he cites seems "cherry-picked" when read against simultaneous records showing that Plaintiff was continuing to experience ongoing back pain, limited motion,

---

[19]     Plaintiff further argues that Dr. Egan is a "treating physician" whose opinion is by default entitled to controlling weight under the regulations.  (Pl.'s Br. at 10; Pl.'s Reply in Supp. of her Opening Mem. [21] at 6).  This goes too far: as a chiropractor, Dr. Egan was not considered an "acceptable medical source" and could not be classified as a treating physician under the regulations then in effect for Plaintiff's claim.  *See* 20 C.F.R. § 416.927(a)(2), (f); SSR 06–03p, 2006 WL 2263437 (Aug. 6, 2006), *rescinded*, 2017 WL 1105349 (Mar. 27, 2017).  That said, the ALJ should at minimum have explained what weight (if any) he gave to Dr. Egan's opinion and given more attention to the objective medical evidence contained in his notes.  *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

and weakness through the end of 2016 and up to the date of her hearing in April 2017. *Busz v. Comm'r of Soc. Sec.*, No. 1:20-CV-00398-SLC, 2022 WL 354693, at *5 (N.D. Ind. Feb. 7, 2022) (noting that while ALJ cited records stating that the claimant "had significantly improved" after surgery and displayed "normal findings" on some tests, she omitted other records from the same time period tending to suggest that his condition "had worsened"). The records from Plaintiff's course of physical therapy in early 2017—which the ALJ did not reference or discuss at all— describe ongoing radicular pain, limited range of motion, and muscle weakness in Plaintiff's lower extremities due to disuse. (R. 805, 807, 820, 847).

The court is mindful of the Commissioner's then-existing policy under 1.04A (and its revised equivalent now in effect) that all four criteria must both occur simultaneously for a continuous period of at least twelve months in order to establish Listing-level severity.[20] There is at least some evidence that Plaintiff's neck and back problems do not meet this threshold: for example, her 2017 records show some improvement in response to physical therapy. (*See, e.g.*, R. 848, 859.) So, too, for the Listing's requirement that the straight-leg raise tests be positive in both sitting *and* supine positions; most of Plaintiff's tests do not specify one way or the other. *See Jeske*, 955 F.3d at 591. But the ALJ does not even begin to address these requirements in his decision, much less explain how (if at all) they are not met. "Consequently, this is a case in which both the ALJ's step-three discussion about listing 1.04A and the RFC analysis is inadequate with respect to [Plaintiff's] . . . spine impairment." *Busz*, 2022 WL 354693, at *6 (citing *Minnick*, 775 F.3d at 935–58, and *Zellweger*, 984 F.3d at 1255); *see Blankenship v. Comm'r of Soc. Sec.*, 614 F. Supp. 3d 639, 646 (N.D. Ind. 2022) (remanding in spite of ambiguous straight-leg raising tests).

---

[20]     *See* SSAR 15-1(4), 2015 WL 5564523, 80 Fed. Reg. 57,418, 57,420 (Sept. 23, 2015)*, rescinded*, 2020 WL 7209986, 85 Fed. Reg. 79,063 (Dec. 8, 2020); *Revised Medical Criteria for Evaluating Musculoskeletal Disorders*, 2020 WL 7056412, 85 Fed. Reg. 78,164, 78,183–84 (Apr. 2, 2021) (incorporating SSAR 15-1(4) into revised rules).

More evaluation is needed to determine whether Plaintiff's neck and back problems are sufficiently severe to qualify for per se disability under Listing 1.04A.

Defendant argues that because the ALJ weighed the medical opinions of state agency reviewing doctors Galle and Mack—both of whom determined that Plaintiff did not meet or equal any listed impairments—in his RFC analysis, the court must find his decision at Step Three supported by substantial evidence.[21] Not so. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). In this case, both Dr. Galle's and Dr. Mack's opinions predated Plaintiff's July 2015 car crash, which exacerbated her preexisting chronic back pain, and her subsequent MRIs. The doctors did not even identify Listing 1.04 as one of the options they considered, let alone state that Plaintiff did not meet it. (R. 85, 98–100.) Thus, even if the court were to accept the Commissioner's argument that the ALJ implicitly incorporated the non-reviewing physicians' Listing determinations into his analysis at Step Three, such "heavy reliance on opinions from consulting physicians who lacked access to evidence of radiculopathy, significant spinal degeneration, and stenosis [would] 'raise[] concern.'"[22] *Walter O. v. Kijakazi*, No. 20 C 1938, 2022 WL 17352487, at *4 (N.D. Ill. Dec. 1, 2022) (citing *Durham v. Kijakazi*, 53 F.4th 1089, 1094 (7th Cir. 2022)).

_____

[21] Defendant also argues that the ALJ's failure to discuss the agency doctors' reports in the context of his step-three finding was harmless error since he subsequently discussed them in his RFC analysis. (Def.'s Br. at 4.) The court need not address this question; *Jeske*—which was decided after Defendant submitted its briefing—makes clear that a court can review the ALJ's RFC analysis to determine whether his or her conclusions at Step Three were supported. *Jeske*, 955 F.3d at 590. Thus, the ALJ's decision to organize his opinion in this way was not error at all.

[22] Plaintiff is incorrect that the ALJ erred by failing to obtain an additional medical expert opinion on the issue of equivalency. While that may have once the law in this circuit, *see Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004), it has been superseded by the Commissioner's publication SSR 17–2p, which provides new guidance on evidentiary requirements for equivalency findings at the ALJ level. *See* SSR 17–2p, 2017 WL 3928306 (Mar. 27, 2017); *Russell G. v. Saul*, No. 118CV02785DLPTWP, 2019 WL 4409358, at *4 (S.D. Ind.

Moreover, "the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record, and here [Plaintiff] *has* presented contradictory evidence suggesting that [her] impairment meets Listing 1.04A." *Ribaudo*, 458 F.3d at 584 (emphasis in original). As the ALJ appears to have made no attempt to reconcile this contradictory evidence with the state agency doctors' findings, the court cannot "undertake a meaningful review of the ALJ's finding that [Plaintiff] did not satisfy Listing 1.04A." *Plessinger v. Berryhill*, 900 F.3d 909, 917 (7th Cir. 2018); *see also Walter S. v. Saul*, No. 19 CV 929, 2020 WL 7714212, at *3 (N.D. Ill. Dec. 29, 2020) (finding that "the ALJ did not discuss the medical consultants' . . . opinions on the Listings question . . . [or] why – or if – he credited those opinions over the evidence that supported plaintiff's claim" in his RFC analysis).

Plaintiff also argues, less convincingly, that the records could support a finding of per se disability from lumbar stenosis under Listing 1.04C. She notes that her November 2014 MRI showed "mild bilateral neural foraminal narrowing" in the lumbar spine (R. 399). True, records do show evidence of "chronic nonradicular pain and weakness" in Plaintiff's lower back, as 1.04C requires (*see, e.g.*, R. 402, 622, 853), but they do not satisfy its other requirement that the claimant cannot "ambulate effectively, as defined in 1.00B2b." To do so would require a showing that Plaintiff cannot "'sustain[ ] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living,' such as walking a block over rough or uneven surfaces, using public transportation, shopping, banking, and climbing a few steps with the use of a handrail." *Filus v.*

_____

Sept. 16, 2019) (describing 17-2p's effect for cases decided on or after March 27, 2017). As Defendant correctly points out, 17-2p does not require ALJs to obtain updated medical opinions on equivalency if they believe that the evidence presented elsewhere in the opinion supports their conclusions on this front. *See* SSR 17–2p, 2017 WL 3928306, at *3; *Jiri K. v. Kijakazi*, No. 20 C 7621, 2022 WL 2704058, at *4 (N.D. Ill. July 12, 2022). But notwithstanding 17-2p, the ALJ's analysis is incomplete to the extent he relied solely on the state agency doctors' outdated findings. He could have either relied on the reports from Plaintiff's treating physicians or sought additional medical expert input to disprove them; the superseded reports are insufficient on their own to support his conclusion.

*Astrue*, 694 F.3d 863, 867–68 (7th Cir. 2012) (quoting 20 C.F.R. pt. 404, subpt. P, app'x 1, § 1.00B2b(2)). Record evidence, including Plaintiff's own testimony, established that she was able to engage in these activities. (*See, e.g.*, R. 38–39 (Plaintiff's April 2017 testimony that she walks up twelve steps to her apartment); R. 417 (May 2015 exam showing that Plaintiff "ambulated normally in the examination room"); R. 870–71 (Dr. Shahkhan's April 2017 RFC statement opining that Plaintiff could walk one city block or more on rough or uneven ground, stand and walk for three hours, and did not require a cane or other assistive device).) Thus, Plaintiff failed to meet her burden of proving that all of Listing 1.04C's criteria were met.

As explained earlier, however, with respect to Listing 1.04A, Plaintiff is on more solid ground. There is evidence that Plaintiff was experiencing nerve root compression from herniated discs in her neck and back for at least mid-2015 through early 2016, and potentially longer. While the court does not suggest that this evidence necessarily mandates a finding in Plaintiff's favor at Step Three, it "cannot discern from the ALJ's scant analysis whether []he considered and dismissed, or completely failed to consider, this pertinent evidence"; thus, the ALJ "erred by failing to build a logical bridge from the evidence to h[is] conclusion." *Minnick*, 775 F.3d at 936. The evidence is not clear enough to justify reversal, but remand is appropriate to give the Administration further opportunity to adequately consider and articulate the criteria of Listing 1.04A or its revised equivalent.

## II.    The ALJ's Mental RFC Determination

Plaintiff argues that the ALJ erred in failing to factor any limitations for her mental impairments into her RFC. She specifically alleges that the ALJ neglected opinion evidence from Plaintiff's state-hired psychiatric examiners, and failed to consider corresponding restrictions in his hypotheticals to the VE during the hearing. (Pl.'s Br. at 6–7.)

The Administration has established a "special technique" for evaluating mental impairments that ALJs must explicitly document in their decisions. *See* 20 C.F.R. § 416.920a. This technique requires the ALJ to first determine whether the claimant has a medically

determinable mental impairment, then assess whether any such impairment is "severe" based on four broad "functional areas." *Id.* These areas, known as the "paragraph B criteria," are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See* 20 C.F.R. pt. 404, subp. P., app'x 1, § 12.00(A)(2)(b). Even if the claimant's mental impairments are deemed not severe based on this analysis, the ALJ must still account for them as potential limitations in his RFC analysis. SSR 96–8, 1996 WL 374184, at *5 (July 2, 1996); *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013). In general, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citation omitted).

The ALJ did acknowledge Plaintiff's mental impairments in his hypotheticals to the VE at the April 20, 2017 hearing: He asked the VE to account for the jobs available to an individual who could neither (1) work on joint tasks with other workers, nor (2) respond to the public on more than an occasional basis, and later added an additional restriction of (3) being either "off task" for more than 15% of a typical work day or absent for more than two days a month. (R. 64, 67.) None of these restrictions, however, ultimately made it into the ALJ's RFC determination. (R. 114.) Instead, in his step-two analysis,[23] the ALJ concluded that Plaintiff's medically-determinable depression, anxiety disorder, and panic attacks with agoraphobia imposed only "mild limitations" in all four functional areas and "do not cause more than minimal limitation in the claimant's ability to perform basic mental work abilities . . . ." (R. 113.) He based this conclusion on Plaintiff's statements about her living situation, daily activities, and interactions with others. (*Id.*) While he summarized the results from Drs. Gil and White's opinions in his RFC analysis, he did not state what weight he ascribed to either psychiatrist's report. (R. 116–17.)

---

[23] Because "it is proper to read the ALJ's decision as a whole," *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), the court will assume that the ALJ's RFC analysis incorporates his earlier step-two analysis in determining whether he adequately accounted for Plaintiff's mental limitations in determining her ability to work.

The ALJ should have done so. In general, an ALJ has a duty to both consider all medical opinions in the record and discuss what weight he assigns to such opinions. *See* 20 C.F.R. § 416.927(b)–(c). Dr. Gil's opinion was potentially significant: she concluded Plaintiff had "moderate" depressive disorder and "severe" generalized anxiety disorder and suffered panic attacks with agoraphobia. (R. 377.) As a consultant retained by the state, Dr. Gil was "unlikely . . . to exaggerate [Plaintiff's] disability," since Plaintiff was "not [her] patient and favoritism with applicants would not go down well with the agency . . . ." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). While the ALJ did assign "some weight" to "[t]he residual functional capacity conclusions employed by the physicians employed by the state Disability Determination Services"—i.e., the non-examining physicians who reviewed Plaintiff's claim, including psychiatrists Pittman and Hollerauer—"a contradictory opinion of a non-examining physician does not, by itself, suffice to reject an examining physician's opinion." *Thompson v. Berryhill*, 722 F.App'x 573, 581 (7th Cir. 2018) (citations and internal quotation marks omitted). Even if the ALJ had expressly weighed Dr. Gil's report against Drs. Pittman's and Hollerauer's, "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled … can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Id.* (citation omitted). No such explanation was given.

That said, neither of the two examining psychiatrists' reports are as obviously helpful to Plaintiff's cause as she appears to believe they are. Dr. White acknowledged that Plaintiff suffered from generalized anxiety disorder and depression, but he did not assess the level of severity of those diagnoses; he also noted in his summary that she appeared to have "adequate Adaptive Behavioral Functioning." (R. 424.) And while Dr. Gil characterized Plaintiff's impairments as "severe," neither she nor Dr. White prepared a mental RFC form or made any other statements specifically addressing what effect these impairments had on Plaintiff's ability to work. Further, both psychiatrists observed that Plaintiff had never sought any professional treatment for her anxiety and depression beyond taking medication. (R. 374, 422.)

26

Thus, the court cannot definitively say that substantial evidence compelled a contrary finding on the ALJ's incorporation of Plaintiff's mental impairments into her RFC. "However, because the matter is being remanded, the ALJ should address any contradictory evidence suggesting the need for additional [mental] limitations in the RFC." *Blankenship*, 614 F. Supp. 3d at 647. Specifically, the ALJ should on remand explain what weight he is assigning to Drs. Gil and White's reports. And if he ultimately reaches the same conclusion (that Plaintiff's mental impairments are only "mild" and should not be factored into her RFC), he should more expressly address Dr. Gil's diagnosis—as well as any other new evidence shedding light on Plaintiff's degree of mental limitations—in his decision to do so.

### III.    The ALJ's Weighing of Medical Opinion Evidence

Next, Plaintiff argues that the ALJ erred by failing to account for the objective medical evidence in the record before considering the credibility of her symptoms. While much of this evidence has already been addressed in the previous sections, one thread deserves further examination: the relative weight assigned to the opinions of Plaintiff's treating primary-care physicians Drs. Shahkhan and Verma, versus that of state-hired examiner Dr. Rana.

Under the rules applicable to Plaintiff's claim,[24] the opinion of a treating physician "regarding the nature and severity of a medical condition" is entitled to "controlling weight" unless the ALJ sets out "good reasons" for assigning it lesser weight. 20 C.F.R. § 416.927(c)(2); *Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). These "good reasons" are set forth by regulation and include "the treatment relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician." *Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018); *see* 20 C.F.R § 416.927(c)(2)–(6). State-

---

[24]    The Administration significantly overhauled its regulations regarding the evaluation of medical opinions in 2017; this change was published prior to the ALJ's decision in June 2017, but was only effective prospectively to applications filed after March 27, 2017, meaning that Plaintiff's claim (filed in March 2014) remains governed by the prior regime. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).

hired consulting examiners, in contrast, are not afforded this presumption as they lack a long-term care relationship with the patient and may interact with them for no more than a short amount of time. *See* 20 C.F.R. § 416.927(c)(2)(i); *Simila v. Astrue*, 473 F.3d 503, 514 (7th Cir. 2009). The views of state-hired non-examining review physicians, who do not have the benefit of meeting the patient face-to-face, are afforded even less weight. *See* 20 C.F.R. § 416.927(c)(1); *Thompson*, 722 F. App'x at 581.

Drs. Shahkhan and Verma are Plaintiff's treating physicians. They reported multiple times to the Administration that Plaintiff has been seeking treatment in their clinic since 2005. (R. 247, 403, 425, 869.) They had extensive and regular contact with Plaintiff, often several times a month, in the years following Plaintiff's initial application for benefits. (R. 392–402, 415, 613–57.) These regular visits always included general physical checkups and consultations. (*Id.*)

The ALJ acknowledged the length of Dr. Shahkhan's treating relationship with Plaintiff, but still assigned her opinions "little weight." (R. 118.) He noted that Dr. Shahkhan's "notes do not support the degree of limitation described in his [sic] capacity assessments," and that "[t]here is no indication that the claimant would miss three days of work per week due to her combination of impairments." (*Id.*) He described Dr. Shahkhan's RFC statements as "quite conclusory, providing very little explanation of the evidence relied on in forming them," and asserted that she "did not have the benefit of reviewing the other medical records contained in the current record."[25] (*Id.*) Similarly, he found Dr. Verma's November 2014 note stating that Plaintiff was unable to work lacking in evidentiary support, and specifically observed that "[t]here is no indication of the period

---

[25]     The court is not certain this is true. As Plaintiff notes, Dr. Shahkhan attested on her three RFC forms that she had based her opinions on Plaintiff's medical history and records, progress and office notes, physical examinations, and X-rays, CT scans, and MRIs—albeit only by checking boxes on the form's preexisting fields. (R. 406, 428, 872.) The ALJ may have been referring specifically to the reports of the state doctors who examined Plaintiff in connection with her application for benefits (i.e., Drs. Rana, Gil, Biale, White, Galle, Mack, Pittman, and Hollerauer). These reports, which were specifically generated for the purposes of Plaintiff's disability application, may not have been available to Drs. Shahkhan and Verma.

addressed in her statement." (*Id.*) In contrast, the ALJ assigned Dr. Rana's opinion "great weight," finding it "well supported by medically acceptable clinical diagnostic technique" and "consistent with other substantial evidence in this matter," and noting that Dr. Rana "was able to listen to the claimant's subjective complaints." (*Id.* (citation omitted).)

The ALJ may not have erred in refusing to assign Drs. Shahkhan and Verma's opinions controlling weight, but the court concludes he did not sufficiently explain his decision to find their opinions deserving of less weight than Dr. Rana's. The ALJ's discussion of Drs. Shahkhan and Verma's opinions alluded to (though did not explicitly reference) at least some of the regulatory factors for weighing medical evidence in 20 C.F.R. § 416.927(c).[26] He found that they did not clearly "present[] relevant evidence" to support their conclusions or provide a satisfactory "explanation for [their] medical opinions," 20 C.F.R. § 416.927(c)(3), and characterized them as not "consistent . . . with the record as a whole," *id.* § 416.927(c)(4). This was not clearly wrong, given the informal nature of their (often handwritten) notes and the lack of supporting documentation or analysis attached to their reports.[27] Moreover, although the ALJ did not mention this, Drs. Shahkhan and Verma's status as non-specialist family practitioners also makes their opinions on Plaintiff's musculoskeletal and other issues somewhat less weighty. *Id.* § 416.927(c)(5).

---

[26]     In some circumstances, an ALJ's failure to explicitly name and work through these regulatory factors may in and of itself require remand. *See Wallace v. Colvin*, 193 F. Supp. 3d 939, 947 (N.D. Ill. 2016). However, such a failure is subject to harmless error review. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). The ALJ's technical failure to list the factors verbatim was not reversible error under *Karr*, but his threadbare discussion of their underlying content is insufficient.

[27]     This is particularly true for Dr. Verma's November 2014 "opinion" that Plaintiff is unable to work, which consists of two sentences on a pharmacy prescription slip, does not specify what time period it applies to, and appears to be signed by Dr. Verma's physician assistant rather than Dr. Verma herself. The ALJ did not, as Plaintiff argues, err by failing to follow up with Dr. Verma for clarification about this one record—particularly since Dr. Shahkhan's three RFC statements essentially provide a more detailed version of the same opinion.

But the ALJ's summary dismissal of Drs. Shahkhan and Verma's opinions in favor of Dr. Rana's was inappropriate given the length and extent of their contact with Plaintiff. *See id.* § 416.927(c)(2). They had more than a "decade-long treating relationship" with Plaintiff by the time of her hearing in April 2017. *Knapp v. Berryhill*, 741 F. App'x 324, 328 (7th Cir. 2018). Given their status as Plaintiff's first point of contact for medical issues, their notes are a highly detailed record of how her physical and mental symptoms evolved over time; these notes include multiple findings (like positive straight-leg raises and lumbar tenderness) that support her claim for disability based on degenerative disc disease (*see, e.g.*, R. 392–96, 415, 622, 638, 641). *See Knapp*, 741 F. App'x at 328; *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records.")

It is true, as the Commissioner notes, that Dr. Shahkhan did not identify any particular selections or passages in her or Dr. Verma's notes as support for her RFC opinions. It is also true that the ALJ read several of these notes, in which Plaintiff reported no back pain or GI issues, as inconsistent with Dr. Verma's assessment of the extent of Plaintiff's physical limitations. (R. 117.) But Drs. Shahkhan and Verma's notes "span many years and consume many pages," and some amount of inconsistency between visits is inevitable. *Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012); *Stage*, 812 F.3d at 1126. Further, Drs. Shahkhan and Verma were Plaintiff's primary-care physicians and saw her for a range of issues; they would not necessarily have recorded her entire panoply of symptoms in any given visit, but were instead more likely to focus on the specific issues for which she was seeking care. (*See, e.g.*, R. 613–14 (noting unremarkable results from "problem focused" physical exam during visit scheduled as follow-up for depression screening)). And as the court has already discussed concerning the step-three analysis, the ALJ's selective quotation of these records is itself contradicted by contemporaneous physical therapy records showing that Plaintiff was continuing to experience problems with her back and neck well into 2017. (R. 805.) If the ALJ wished to discredit Dr. Shahkhan under the

theory that the consistent limitations expressed in her RFC statements did not accurately reflect Plaintiff's recovery, he needed to both say so more directly and account for this ambiguity.

The ALJ's defense of Dr. Rana's opinion, in contrast, is just an *ipso facto* recitation of the factors listed in the Administration's regulations for when a source should be given controlling weight. *See* 20 C.F.R. § 416.927(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."); *Schmidt v. Colvin*, 545 F. App'x 552, 557 (7th Cir. 2013) (finding such "boilerplate . . . entirely unhelpful"). The wisdom of reliance on Dr. Rana's opinion is undermined by the fact that it was based on a single 30-minute consultative exam that predated both Plaintiff's 2014 fall and her 2015 car accident and was already almost three years out of date by the time the ALJ reviewed it. Drs. Shahkhan and Verma, in contrast, treated Plaintiff through at least December 2016 and regularly documented the immediate and ongoing physical issues she experienced following these incidents (*see*, *e.g.*, R. 398, 652). *See Walker*, 900 F.3d at 485 ("In the face of [the plaintiff's] deteriorating condition, the record does not support the ALJ's decision to prefer [an examining physician's] one-time assessment . . . over the views and prognosis of [the plaintiff's] treating physician from a later point in time."); *Van Buskirk v. Saul*, No. 18 C 8035, 2022 WL 475968, at *16 (N.D. Ill. Feb. 15, 2022) ("[E]vidence that post-dates the opinions of the state agency medical consultants is significant in that it calls into question the logic of assigning those opinions "great weight") (citing *Stage*, 812 F.3d at 1125).

The court thus concludes that the ALJ erred by failing to adequately justify his decision to weigh the opinion of a state-hired consultant over Plaintiff's treating physicians. And this error was not harmless, as Dr. Shahkhan's three RFC statements recommended greater limitations on Plaintiff's ability to work than the ALJ ultimately adopted. *Cf. Gedatus*, 994 F.3d at 902–03. On

remand, the ALJ should again consider whether Drs. Shahkhan and Verma's opinions should be given significant weight and explain his ultimate conclusion in greater detail.

## IV.     The ALJ's Evaluation of Plaintiff's Subjective Symptoms

Finally, Plaintiff argues that the ALJ erred in failing to appropriately credit her subjective symptoms.  Although most of her arguments about whether the objective medical record supports or contradicts these statements have already been addressed in substance, two points merit further attention: (1) the ALJ's discussion of her daily activities, and (2) his consideration of her medications.

Under the Administration's two-step process for weighing claimants' subjective statements, the ALJ must first determine whether the claimant has a medically determinable impairment that could be expected to produce the expected pain, and then evaluate the "intensity and persistence" of their self-reported symptoms to determine how much they will limit the claimant's ability to work.  SSR 16–3p, 2016 WL 1119029 (Mar. 16, 2016), *republished*, 2017 WL 5180304 (Oct. 25, 2017).  The ALJ may not summarily dismiss claimants' subjective reports and must instead "set forth specific reasons for discounting" them.  *Gedatus*, 994 F.3d at 900 (citation and internal quotation marks omitted).   In doing so, the ALJ must consider several factors prescribed by regulation, "including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . ."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *see* 20 C.F.R. § 416.929(c).  Courts should defer to an ALJ's reasoned evaluation unless it is "patently wrong."  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

The ALJ summarizes his conclusion on Plaintiff's subjective symptom statements as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 115.)  The Seventh Circuit's long campaign against ALJs' use of this "boilerplate language" need not be repeated at length here.  *See, e.g.*, *Minnick*, 775 F.3d at 936 (collecting cases criticizing a prior version of this template); *Jarnutowski v. Kijakazi*, 48 F.4th 769 (7th Cir. 2022) (applying the same criticism to the updated version at issue in this case).  But use of the boilerplate is not in and of itself grounds for remand; the real question is whether the ALJ meaningfully engaged with Plaintiff's subjective statements elsewhere in the opinion.  *See Gedatus*, 994 F.3d at 900; *Pepper*, 712 F.3d at 367–68.

Plaintiff argues that the ALJ failed to explain how her daily activities, such as driving her daughter to school, handling self-care and personal hygiene, going to church, and running errands, are sufficiently inconsistent with her subjective statements to support an adverse credibility determination.  In the court's view, the record is mixed on how much Plaintiff's impairments actually affected her ability to perform at least some of these activities.  Consider the evidence on Plaintiff's ability to drive and navigate independently: while she reported at one point being unable to travel alone (R. 373), and stated at another point that she frequently got lost and did not remember directions properly (R. 416), she stated in her hearing before the ALJ that she drove her daughter to school and drove herself to her own medical appointments  (R. 35, 43, 50).  Though reportedly unable to travel alone to a doctor appointment in August 2014, she suffered an accident while driving the following year.  In addition, if Plaintiff's descriptions of experiencing repeated panic attacks and crying spells multiple times a day and several days a week are true, one would expect the family members with whom she lives to insist that she seek out more dedicated psychiatric treatment, but the record contains no evidence of any such treatment beyond the antidepressant and antianxiety medication prescribed by her primary-care physicians.

Nonetheless, it is well-established that "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).  The ALJ's failure to even acknowledge this principle is disappointing.  *Cf. Deborah M. v. Saul*, 994 F.3d 785, 791

(7th Cir. 2021) (upholding decision where ALJ stated that, "[w]hile [daily] activities are not being compared to actual work situations, I do not consider evidence regarding the claimant's daily activities as sufficient to establish that she is unable to function at the level I have assessed"). Further, the ALJ's summary of Plaintiff's daily activities (R. 113–14, 118) omits at least some important "qualifications as to *how* [s]he carried out those activities," such as the fact that Plaintiff's mother and daughters reportedly often need to help her dress, perform household chores, and carry her laundry (R. 36–38, 115), and that she often cannot run errands unaccompanied and must wait in the car rather than going into stores due to her agoraphobia. (R. 57–58.) *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (emphasis in original). Although the record indicates that Plaintiff had at least some ability to perform daily household activities on a regular basis, the ALJ failed to sufficiently explain how this and other similar testimony was inconsistent with the physical limitations created by the conditions documented in her medical records.

Similarly, the ALJ did not "clearly articulate[]" why Plaintiff's medication regimen justified an inference of adverse credibility. SSR 16–3p, 2017 WL 5180304, at *9. He characterized it as "minimal" at the end of his opinion. (R. 118.) Perhaps the ALJ concluded that Plaintiff's purported symptoms would have required more extensive medication if legitimate. *See Thorps v. Astrue*, 873 F. Supp. 2d 995, 1002 (7th Cir. 2012). But if this is the "logical bridge" he wishes to cross, it does not appear anywhere in the opinion. And the record does not clearly support such a characterization: Plaintiff showed that she regularly took a variety of antidepressant, thyroid, and pain relief medications, which produced side effects like nausea, dizziness, and drowsiness that could have impacted her ability to work productively. (R. 58–59, 244–45.) The ALJ acknowledged these medications but did not explain why he characterized them as "minimal."

The court is unwilling for now to substitute its judgment for the ALJ's in evaluating Plaintiff's credibility, as the standard for doing so is high. *See Burmester*, 920 F.3d at 511. Because the case is being sent back to the Administration for the reasons noted above, however, the court encourages the ALJ on remand to more fully explain his reasoning on why the objective evidence

of Plaintiff's daily activities and medication regimen is inconsistent with her subjective symptom testimony.

### A. Step-Five Vocational Determinations

Plaintiff finally argues, for the first time in her reply brief, that the ALJ erred in relying on the VE's testimony at step five, since (1)_the VE's estimates were unreliable, and (2) her testimony conflicted with the Dictionary of Occupational Titles in violation of SSR 00–4p. Arguments not raised in an opening brief are typically waived. *See United States v. Vitrano*, 747 F.3d 922, 925 (7th Cir. 2014). In any event, this issue is irrelevant: the court has already determined that the case must be remanded on other grounds, and the Administration will need to conduct a new medical-vocational analysis with a new VE to account for the five years that have passed since the ALJ's first decision. Accordingly, the court will not reach Plaintiff's step-five argument.

### <u>CONCLUSION</u>

In summary, the ALJ's decision must be remanded for further consideration of (1) Plaintiff's eligibility for a finding of per se disability under Listing 1.04, and (2) the relative weight of her medical opinion evidence. On remand, the ALJ is also encouraged to further address additional issues identified in this opinion, including his decision not to factor Plaintiff's mental impairments into her RFC and his consideration of her daily activities and medication regimen in evaluating her subjective symptoms.

The court vacates the ALJ's decision and remands for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). Civil case terminated.

ENTER:

Dated: February 29, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

35